# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF GEORGIA

## SAVANNAH DIVISION

| | | |
|---|---|---|
| LEON MCKINNEY, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. CV409-091 |
| | ) | |
| WARDEN DON JARRIEL, | ) | |
| | ) | |
| Respondent. | ) | |

## REPORT AND RECOMMENDATON

Fearing that a fellow prisoner might reveal his escape attempt, Leon McKinney bear-hugged him while another inmate strangled him. After a jury convicted McKinney of felony murder, he filed unsuccessful direct and collateral appeals. *McKinney v. State*, 281 Ga. 92 (2006); doc. 11-3 (state habeas order and judgment); doc. 11-31 (appeal denied). He now petitions this Court for 28 U.S.C. § 2254 federal habeas relief on the grounds that his trial and appellate lawyers were ineffective and trial errors were committed. Doc. 1 at 4-5. Opposing, respondent urges this Court to respect state-court rulings under § 2254(d). Doc. 9.

# I. BACKGROUND

"Michael Deal, one of eight prisoners housed in the protective custody pod of the Chatham County [Georgia] Detention Center, was found hanging by a bedsheet from the doorframe of his cell on July 24, 2001. His death was believed to be a suicide until three days later, when another prisoner housed in the pod passed to a jail officer a note which stated Deal had been murdered by other inmates." *McKinney*, 281 Ga. at 92. A grand jury indicted McKinney for one count of malice murder and one count of felony murder (aggravated assault). *Id.* at 92 n. 1.

A trial jury convicted him of only the felony murder charge, and he received a life sentence. *Id.* McKinney then moved for a new trial and appealed. *McKinney* supplies further background:

> [Pierre Boyd, t]he note-passing inmate testified that he, the victim, and [McKinney] were housed in the same pod at the jail, and that [McKinney] and four pod inmates other than the victim were engaged in a long-term project of chiseling around the window in [McKinney's] cell in an effort to escape. On the day he was killed, the victim saw [McKinney] and two others chiseling at the window. Later that day the victim and another pod inmate were taken separately to the jail's medical facility. Because the two were not taken to the medical facility at the same time as was the usual practice, [McKinney] and the four other chiseling inmates speculated the victim had told authorities about their escape efforts, and they discussed what they needed to do. Later that evening, after the victim had returned to the pod, [McKinney] lifted the victim off the ground in a bearhug and another inmate, co-

indictee Joseph Williams, used an elastic bandage to strangle the victim. Members of the group removed the elastic bandage, replaced it with the victim's bedsheet, and suspended his body from the doorframe of his cell. Shortly thereafter, jail personnel discovered the body.

*Id.* at 92[1] (footnote omitted); SHH Vol. VI at 1506-07, 1567-68, 1584. [2]

Authorities then interviewed the pod's inmates, searched the pod cells, and discovered the chiseling evidence. *Id.* While McKinney was represented by counsel on other charges, GBI Agent John Barry *Mirandized* and interviewed him. That interview was played to his trial jury. McKinney

told [Barry that] he had complied with co-indictee Williams's directive to give the victim a bearhug and, when [McKinney] picked up [Deal], Williams strangled [him] with an elastic bandage. [McKinney] also told the agent that some of the inmates believed the victim had reported to authorities that some inmates were chipping away at the window in [McKinney's] cell.

*Id.* at 92-93. A forensic pathologist's findings corroborated the state's strangulation theory. *Id.* at 93. McKinney raised trial-error and

---

[1] Williams pled guilty to murdering Deal and received the death penalty. *Id.*; *see also Williams v. State*, 281 Ga. 87 (2006).

[2] This is part of a substantial filing in the docket. Doc. 11. Given the sheer density of that filing (it is broken into numerous parts), the Court will alternately cite to the hard-copy, "State Habeas Hearing" (SHH) transcript, "SHH at ___," and this Court's electronic-docket pagination ("doc. ___") respectively. This Court's" E -docket" software supplies top-of-screen-page pagination which, due to formatting issues, may sometimes differ from each document's hard-copy pagination.

ineffective assistance of counsel (IAC) claims on direct appeal. *Id.* His

trial counsel was ineffective, he claimed, because counsel:

> failed to subpoena two witnesses, [Woody Boyd] and a probation officer who purportedly would have testified [that McKinney] wished to recant his inculpatory statement; failed to object to the hearsay testimony of the note-passing inmate recounting what other inmates involved in the slaying said during the course of the conspiracy to kill the victim; and failed to object to testimony concerning [McKinney's] initial statement to authorities in which [he] denied any knowledge concerning the victim's death.

*Id.*

This claim was denied. Trial counsel Richard Darden did not call

the GBI and probation officer witnesses -- he learned of them mid-trial --

because he consulted with McKinney and they decided against that; the

information they would have provided had already been elicited during

cross-examination of the state's witness. *Id.* at 93-94. It thus was "a

reasonable strategic decision that did not constitute deficient

performance." *Id.* at 94.

Darden also was not deficient for failing to object to Byrd's hearsay

because those "statements fell within the exception permitting hearsay

statements made by co-conspirators during the pendency of the

conspiracy." *Id.* As for the testimony concerning McKinney's initial

statement denying knowledge, Darden did not object because it bolstered

4

the defense theory that the initial statement was true and that McKinney had given the subsequent inculpatory statement only after being threatened by Williams. *Id.* That, too, "was a reasonable strategic decision." *Id.*

McKinney also took a polygraph and wanted to get it before the jury. A second lawyer who handled that matter failed to get the prosecution to stipulate to the polygraph test result's admissibility -- a necessary legal prerequisite. McKinney raised an IAC claim against that lawyer, but the *McKinney* court rejected it. Persuading a prosecutor to so stipulate is not something defense lawyers routinely succeed at doing, so failing to do so here was not objectively deficient. *Id.* at 94.

Petitioner next contended that the trial court should have granted his motion to suppress his videotaped "GBI statement" because a lawyer representing him on unrelated charges was not contacted prior to the interview that produced his incriminating statement. The *McKinney* court rejected this claim, too, because petitioner's right to counsel is "offense-specific" and he was *Mirandized* before that interview. *Id.* at 95 (citing *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991)).

Citing *Crawford v. Washington*, 541 U.S. 36 (2004), and his Sixth Amendment right to confront the witnesses against him, McKinney also argued that the trial court erred when it permitted Byrd to relate to the jury statements made by the chiseling inmates when they were discussing what to do about Deal. The hearsay was authorized under Georgia's co-conspirator-hearsay exception, O.C.G.A. § 24-3-5. *Id.* And *Crawford* did not apply because statements made in furtherance of a conspiracy are not "testimonial." *Id.* at 96.

As previously noted, McKinney next filed an unsuccessful state habeas petition that generated a 2000-page record now before this Court. Doc. 11. It contains evidence on IAC claims that McKinney raised against not only Darden, but also Martin G. Hilliard, who handled his new-trial motion and then his appeal. Doc. 11-4 at 38-39. Before the state habeas court McKinney adduced a January 12, 2004 pretrial letter that co-defendant Williams had written to McKinney's mother. Williams had offered to sell favorable testimony to her. Doc. 11-4 at 64-65, 67-68. Darden handed the letter over to the prosecutor, and sought to call Williams to the stand but he successfully invoked his Fifth Amendment right not to testify. The trial court thus excluded the letter as hearsay.

Before this Court McKinney now faults Hilliard for failing to argue, under *Holmes v. South Carolina*, 547 U.S. 319 (2006), that his right to present the letter trumped the state's interest in excluding hearsay from its trials. Doc. 1 at 3 ("Ground one"). He also raises eight other, exhausted claims:

**Ground two**: Ineffective Assistance of Trial Counsel in failing to call John McMillan as witness at trial.

**Ground three:** Ineffective Assistance of Appellate Counsel in failing to claim that trial counsel was ineffective for failing to call John McMillan as a witness at trial.

**Ground four:** Ineffective Assistance of Counsel at Trial and on Appeal in failing to call Agent Woody Boyd and PO Patti Simmons at Trial and at the Motion for New Trial Hearing.

**Ground five**: Ineffective Assistance of Trial Counsel in failing to object to hearsay evidence which unduly harmed Petitioner's case.

**Ground six:** Ineffective Assistance of Trial Counsel in failing to object to admission of Petitioner's initial statement to [GBI] Agent Barry, which was neither a confession nor an admission, and thus hearsay without exception.

**Ground seven**: Ineffective Assistance of Trial Counsel in not securing a stipulation from the State that polygraph results, favorable to the Defense, would be admissible at Trial.

**Ground eight:** Trial Court erred in allowing into evidence Petitioner's second statement to agent which was improperly given due to fact that Petitioner was incarcerated on another charge and already represented by counsel, as such Agent Barry never should

have interviewed Petitioner at all without first contacting Petitioner's counsel.

**Ground nine**: Trial Court erred when Pierre Byrd was allowed to give testimony regarding the Statements of John McMillan and Joseph Williams regarding the alleged conspiracy between the four of them, thus violating the Petitioner's right to confront his accuser as guaranteed by the Six Amendment of the United States Constitution.

*Id.* at 3-5. While respondent invokes no exhaustion defense on these claims, some (e.g., the polygraph stipulation) are barely developed beyond restating them as presented to the state courts. Doc. 10. Conclusory claims, of course, warrant no evidentiary hearing and, typically, receive summary treatment. *Allen v. Secretary, Florida Dept. of Corrections*, 611 F.3d 740, 745 (11th Cir. 2010).

## II. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) placed "a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bell v. Cone*, 535 U.S. 685, 693 (2002) (AEDPA was intended "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent

possible under law."); *see Peterka v. McNeil*, 532 F.3d 1199, 1200-01 (11th Cir. 2008) (under AEDPA a federal court's review of a state court ruling is "greatly circumscribed and highly deferential to the state courts") (citation omitted); *Trotter v. Sec'y, Dep't of Corr.*, 535 F.3d 1286, 1290 (11th Cir. 2008) (AEDPA limits a federal court's review of a state court's decisions "and establishes a general framework of substantial deference for reviewing every issue that the state courts have decided.") (citations omitted). These restrictions on federal habeas review are set forth in 28 U.S.C. § 2254(d), which provides that a federal court may grant a writ of habeas corpus for a claim adjudicated on the merits in state court only if the state court adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

The "threshold question" under § 2254(d)(1) is whether the habeas petitioner is seeking to apply a rule of law that was clearly established at the time his state court conviction became final. *Williams*, 529 U.S. at

390.  Since the statute expressly provides that only pronouncements "by the Supreme Court of the United States" qualify as "clearly established Federal law," 28 U.S.C. § 2254(d)(1), a federal habeas court may not look to the "the case law of the lower federal courts" in determining what federal law is "clearly established." *Putnam v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001).  Further, the statute "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412. These "holdings -- the exclusive touchstone for clearly established federal law -- must be construed narrowly and consist only of something akin to on-point holdings." *House v. Hatch*, 527 F.3d 1010, 1015 (10th Cir. 2008).

So unless a prior Supreme Court decision "squarely addresses" the issue presented in the habeas case, *Wright v. Van Patten*, 552 U.S. 120, 125 (2008), or establishes a legal principle that "clearly extend[s]" to the conduct at issue in that case, then it cannot be said that the law is clearly established under AEDPA.  *Id.* at 123; *Moses v. Payne*, 555 F.3d 742, 754 (9th Cir. 2009).  Thus, "federal courts may no longer extract clearly established law from the general legal principles developed in factually distinct contexts." *House*, 527 F.3d at 1017.  If the federal habeas court

makes a threshold determination that the law was not clearly established at the time the state court issued its decision, then that finding is dispositive in the § 2254(d)(1) analysis, and there is no need for the Court to assess whether the state court's decision conflicts with controlling United States Supreme Court authority. *Id*.

But where the Supreme Court has decided the issue addressed by the state court, the federal habeas court must determine whether the state court's decision is "contrary to" or involves an "unreasonable application" of the controlling precedent. These § 2254(d)(1) clauses have independent meaning and furnish separate bases for reviewing a state court's decisions. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 404-05; *Putnam*, 268 F.3d at 1241 (11th Cir. 2001). A state court decision is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Williams*, 529 U.S. at 405-06, 412-13.

In contrast, a state court decision involves an "unreasonable application" of clearly established federal law where it correctly identifies

the governing legal rule from the Supreme Court's cases but applies it unreasonably to the facts of the particular prisoner's case. *Id.* at 407-08, 413. Thus, "[a] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Instead, the state court's application of Supreme Court precedent must be "objectively unreasonable." *Id.* at 409; *Bell*, 535 U.S. at 694; *Parker v. Head*, 244 F.3d 831, 835 (11th Cir. 2001). That presents "a substantially higher threshold" than the pre-AEDPA standard. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *see McDaniel v. Brown*, ___ U.S. ___, 130 S. Ct. 665, 671-674 (2010) (illuminating lower court's violation of § 2254(d)(1)).

Federal courts also must presume state court factual findings to be correct unless they are rebutted by the petitioner "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). This statutory presumption of correctness applies to findings of fact made by both state trial and appellate courts. *Mason v. Allen*, 605 F.3d 1114, 1118-19 (11th Cir. 2010); *Dill v. Allen*, 488 F.3d 1344, 1354 (11th Cir. 2007). Such

deference does not apply, however, to mixed determinations of law and fact. *Parker*, 244 F.3d at 836.

Finally, a state court's decision rejecting a constitutional claim on the merits is entitled to deference even if the decision is summary in nature and offers no discussion of the court's reasoning. *Wright v. Moore*, 278 F.3d 1245, 1253-54 (11th Cir. 2002) (two-sentence opinion affirming defendant's conviction constituted a rejection of his claim on the merits so as to warrant deference); *Parker*, 331 F.3d at 776 ("the summary nature of [the] decision does not lessen the deference that it is due"); *see Smith v. Spisak*, ___ U.S. ___, 130 S.Ct. 676, 688 (2010).

McKinney's IAC claims require this Court to apply two additional layers of analysis. To

> prevail on a claim of ineffective-assistance-of-counsel, [McKinney] must demonstrate that: (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the outcome of the proceedings. *See Strickland* [*v. Washington*, 466 U.S. 668, 687 (1984)]. "Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa." *Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000) (citation omitted).

*Gaedtke v. Secretary, Dept. of Corrections*, 369 Fed.Appx. 12, 17 (11th Cir. 2010). But the screws tighten up where the state appellate and habeas courts reached a § 2254 petitioner's IAC claims. Then, in

> addition to the deference to counsel's performance mandated by *Strickland*, the AEDPA adds another layer of deference -- this one to a [S]tate court's decision-when we are considering whether to grant federal habeas relief from a [S]tate court's decision." *Rutherford v. Crosby*, 385 F.3d 1300, 1309 (11th Cir. 2004) (citation omitted). Thus, [the petitioner] not only has to satisfy the elements of the *Strickland* standard, but he must also show that the State "court applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Blankenship*, 542 F.3d at 1271 (emphasis in original) (quoting *Rutherford*, 385 F.3d at 1309).

*Williams v. Allen*, 598 F.3d 778, 789 (11th Cir. 2010); *see also DeYoung v. Schofield*, 609 F.3d 1260, 1283 n. 22 (11th Cir. 2010).

Finally, it is "the petitioner's burden to establish his right to habeas relief[,] and he must prove all facts necessary to show a constitutional violation." *Blankenship v. Hall*, 542 F.3d 1253, 1270 (11th Cir. 2008) (cite omitted); *Williams*, 598 F.3d at 788.

## III. ANALYSIS

### A. Hearsay and the Confrontation Clause

Many of McKinney's claims turn on hearsay and Confrontation Clause issues. In ground five and nine, for example, he insists that the state violated his rights (and that his lawyers were ineffective for

bungling this claim) when it used inmate hearsay statements against him. Doc. 10 at 6. And in ground one, he contends that the state violated his rights when his trial judge excluded exculpatory but hearsay statements (the January 12, 2004 letter) from Williams. *Id.* at 2-3.

These issues are best viewed through a brief recap of applicable constitutional standards. The Sixth Amendment guarantees a defendant's right to confront those who bear testimony against him. A witness's testimony against a defendant is thus inadmissible unless he appears at trial or, if he is unavailable, the defendant had a prior opportunity to cross-examine him. *Melendez-Diaz v. Massachusetts*, ___ U.S. ___, 129 S. Ct. 2527, 2531 (2009) (a defendant has a Sixth Amendment right to confront a police analyst who attests to drug evidence against him). Pre-*Crawford* courts could admit unconfronted, out-of-court statements bearing adequate "indicia of reliability," and such indicia were presumed if "a firmly rooted hearsay exception" applied. *Ohio v. Roberts*, 448 U.S. 56, 66 (1980).

But *Crawford* overruled *Roberts*. *Crawford*, 541 U.S. at 62. So now it generally does not matter if there exists a hearsay exception; the defendant must be given an opportunity to confront and thus cross-

examine his accusers. Nevertheless the right to confront and cross-examine does not apply to statements that are "nontestimonial." *Crawford*, 541 U.S. at 59[3]; *United States v. Darling*, 2010 WL 3605761 at * 8 (11th Cir. Sep. 17, 2010) ("Because business records are inherently nontestimonial, [their] admission did not violate Darling's rights under the Confrontation Clause.") (cite omitted). And statements in furtherance of a conspiracy are "by their nature ... not testimonial." *Crawford*, 541 U.S. at 56; *United States v. Diaz*, 377 F. App'x. 883, 2010 WL 1767248 at * 5 (11th Cir. May 4, 2010).

Meanwhile, the Sixth Amendment's Compulsory Process Clause guarantees a defendant the right to call witnesses "in his favor." U.S. Const., Amdt. 6. "The text of the Amendment contemplates two classes of witnesses -- those against the defendant and those in his favor. The prosecution must produce the former; the defendant may call the latter." *Melendez-Diaz*, 129 S. Ct. at 2534.

---

[3] "Nontestimonial" evidence includes statements made during a police interrogation when the objective circumstances indicate that the "primary purpose" was to meet an "ongoing emergency." *Davis v. Washington*, 547 U.S. 813, 822 (2006); *see also Michigan v. Bryant*, ___ U.S. ___, 130 S. Ct. 1685 (2010) (granting certiorari on whether inquiries of wounded victims concerning the perpetrator are non-testimonial if they objectively indicate that the purpose of the interrogation is to enable police assistance to meet an ongoing emergency, and, thus, not afforded heightened protection under *Crawford*).

Contrast, then, the *Crawford* rule, which protects a defendant from hearsay flowing from prosecution witnesses against him, with the "*Holmes*" rule, under which the defendant's right to a "meaningful opportunity to present a complete defense" trumps a state rule that, because the defense is perceived as too thin, can be used to exclude his evidence. *Holmes*, 547 U.S. at 331. *Holmes* decided "whether a criminal defendant's federal constitutional rights are violated by a state court's application of an evidence rule under which the defendant may not introduce proof of third-party guilt if the prosecution has introduced forensic evidence that, if believed, strongly supports a guilty verdict." *Id*. at 321. The *Holmes* Court examined whether the trial court denied Holmes a fair trial when it excluded his evidence of third-party guilt because it did not raise a reasonable inference of innocence. The trial judge applied a state law rule allowing such evidence only if it raises a reasonable inference or presumption as to the defendant's own innocence -- but not if it merely cast a bare suspicion upon another, or raises only a conjectural inference that another committed the crime. *Id*. at 329.

That ruling, the *Holmes* Court held, violated Holmes's Fourteenth Amendment Due Process right by improperly focusing on the strength of

the prosecution's case instead of on the probative value or the potential adverse effects of admitting the defense's third-party guilt evidence. *Id.* at 331[4]; *see also* GA. HANDBOOK CRIMINAL EVIDENCE § 4:25 (2010). *Holmes's* bottom line: A trial court must not one-sidedly weigh evidence, but only exclude it based on traditional evidentiary principles, i.e., the "well-established rules of evidence [that] permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Holmes*, 547 U.S. at 326. *Holmes*

> therefore prohibits "arbitrary rules of evidence which serve no legitimate purpose." *Duckett v. McDonough*, 701 F. Supp. 2d 1245, 1259 (M.D. Fla. 2010); *Eliakim v. McDonough*, 2008 WL 4272832 at * 8 (S.D. Fla. Sept. 18, 2008). At the same time, a defendant cannot transform the exclusion of [defense] evidence into constitutional error [merely] by arguing that [he] was deprived of [his] right to present a defense. The right to present a defense is clearly fundamental, but the accused must comply with established

---

[4] The Court illuminated the constitutional flaw in the state's procedure:

Under this rule, the trial judge does not focus on the probative value or the potential adverse effects of admitting the defense evidence of third-party guilt. Instead, the critical inquiry concerns the strength of the prosecution's case: If the prosecution's case is strong enough, the evidence of third-party guilt is excluded even if that evidence, if viewed independently, would have great probative value and even if it would not pose an undue risk of harassment, prejudice, or confusion of the issues.

*Holmes*, 547 U.S. at 329.

rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.

*United States v. Waters*, ___ F.3d ___, 2010 WL 3565259 at * 6 (9th Cir. Sep. 15, 2010) (quotes, cites, and alterations omitted); *see also United States v. Lighty*, 2010 WL 3156777 at * 21 (4th Cir. Aug. 11, 2010) (proffered testimony of two witnesses that they saw individual with firearm that looked similar to weapon used in kidnapping and murder was not admissible to establish existence of alternative perpetrator, in prosecution for kidnapping resulting in death; testimony provided no nexus between crime and individual, witnesses were not experts in firearms, and proffer did not contain inkling why witnesses felt there was similarity between firearm possessed by individual and murder weapon).

With that analytical prism in mind, the Court now turns to McKinney's federal claims, as threaded through the state habeas court's opinion, which in turn must be accorded due deference under § 2254(d).

## B. Ground One: The *"Holmes"* Claim

Co-defendant Williams, who pled guilty and received a death sentence, wrote McKinney's mother before McKinney's trial and offered to exonerate McKinney for $1,000. Doc. 11-4 at 12-13; State Habeas Hr.

Tr. (SHH) Vol. I at 12-13. She handed the January 12, 2004 letter over to Darden, who gave it to the prosecutor. SHH Vol. I at at 16-18. The trial court excluded it as hearsay. *Id.* at 17; *see also* SHH Vol. V at 1373-75. Williams invoked his Fifth Amendment right to remain silent and thus became unavailable, which led McKinney to invoke the "necessity" exception to Georgia's hearsay rule. The trial judge still ruled against him. SHH Vol. V at 1362, 1374-75.

After McKinney's appellate lawyer, Martin G. Hilliard, filed McKinney's appellate brief, a lawyer contacted McKinney's mother about the then just-issued *Holmes* case; she then passed it on to Hilliard. Doc. 11-4 at 18; SHH Vol. I at 18. Hilliard's email response evinced his belief that, since he had just filed his brief, he could not without difficulty raise a *Holmes* claim before the Georgia Supreme Court. Doc. 11-4 at 18, 66; SHH Vol. 1 at 18 & ex. P-2 ("bates stamp" page 65); *see also* doc. 11-4 at 43 (Hilliard had just filed the appellate brief, and he didn't think the *Holmes* case "was close enough to the *Crawford* issue" to be worth the effort to raise it).[5] He also evidently believed that "the *Holmes* claim"

---

[5] Hilliard later testified at McKinney's state habeas hearing that he did think about it. He recalled reasoning that in *Holmes* there was a lot of forensic evidence against Holmes, and so the trial court there erred by weighing that prosecution evidence,

was best saved for *this* Court and that McKinney would face no procedural default by so waiting.

As McKinney now correctly points out, no Georgia Supreme Court rule prevented Hilliard from filing a supplemental brief to raise the *Holmes* claim.[6]  Doc. 10 at 7-8.  And Hilliard admitted that "I could be completely wrong about this . . . ."  Doc. 11-4 at 44; SHH Vol I at 44.[7]

---

decided the defense evidence was comparatively weak, then, unconstitutionally, it turns out, excluded the weak defense evidence.  Here, in contrast, "McKinney's case did not have an overwhelming amount of forensic evidence against it.  [His] case was mainly a testimonial case, a series of witnesses testifying as to what they saw or heard or what people told them."  Doc. 11-4 at 43-44; SHH Vol. I at 43-44.  Hilliard thus was concerned that the Georgia Supreme Court "would parse it out and yes, if this case was like *Holmes*, then we would have to follow this rule, but, however, there's not an overwhelming amount of forensic evidence.  There were -- [McKinney] was allowed to present other testimony and evidence to get his story out and his case out, which did, in fact, occur during the trial.  So because of that, this is not the same case as *Holmes*.  And honestly, that was a very real concern."  SHH Vol. I at 44.

On cross-examination Hilliard clarified that he did not read *Holmes* as limited to forensic-evidence cases; rather, "given my experience with the Georgia Supreme Court, what I was concerned about was -- is that they would parse *Holmes* out and state that because this wasn't a case that relied almost exclusively on forensic evidence like Holmes did that this case doesn't fall under that category of cases so that it would apply to Mr. McKinney."  *Id.* at 45-46.

[6]  Georgia Supreme Court Rule 24 says, in its entirety: "SUPPLEMENTAL BRIEFS. Supplemental briefs may be filed at any time before decision. Any such briefs which serve only to circumvent the limitation on pages for civil cases set out in Rule 20 will not be considered."  Ga. S. Ct. R. 24 ("Adopted effective May 22, 1995; amended effective June 5, 1997; September 1, 2001.").

[7]  In fact, he conceded that he could have filed a supplemental brief regarding the new case.  Doc. 11-4 at 45-46.  And he still fundamentally misunderstood basic habeas rules, insisting that McKinney should bypass state habeas court and proceed directly to federal habeas court lest McKinney violate the one-year statute of

Too, McKinney argues, the state violated his Fourteenth Amendment, due process, and substantive due process rights when it applied its hearsay evidence rule (embodied in *Chapel v. Georgia*, 270 Ga. 151, 155 (1998)) to weigh prosecution witness testimony against the Williams letter evidence, and this violates his substantive due process and due process rights. Doc. 10 at 9.

McKinney presented this issue to the state habeas court. It ruled that Hilliard's reasoning -- that the state supreme court might parse and adversely apply *Holmes*, and that the *Crawford* claim was McKinney's most meritorious enumeration -- "was a reasonable tactical decision, which *any* competent attorney in the same situation would have made; [McKinney therefore] has failed to show that [Hilliard's] performance was deficient." Doc. 11-3 at 6 (emphasis added). In any case, that court further concluded, McKinney cannot show prejudice because no *Holmes* violation occurred. *Id.* at 7-8.

The record shows that Williams pled the Fifth Amendment and thus would not testify that he sent the letter, which rendered it

---

limitations (i.e., Hilliard seemed oblivious to the fact that such clock is stopped so long as a defendant timely files a state habeas petition and that petition remains pending). Doc. 11-4 at 46-50; *see also id.* at 50 ("I didn't know it was tolled when you're pursuing a state habeas.").

inadmissible hearsay (the state trial court ruled) under state law. SHH Vol. V at 1362, 1374-75. Georgia does not recognize a *third* party's declaration against penal interest exception to its hearsay rule,[8] and the trial judge "did *not* weigh the letters against the State's evidence, as was the case in *Holmes*, but [instead] duly considered whether [McKinney] had sufficiently proven the reliability of the letters and only then determined that Petitioner had not met his burden." Doc. 11-3 at 7-8 (emphasis added); *see also* SHH Vol. V at 1322 (Darden conceded these points).

McKinney argues to this Court that the state habeas court unreasonably applied federal constitutional law in ruling Hilliard not ineffective. He thus must show "that no competent counsel would have taken the action that his counsel did take." *Williams,* 598 F.3d at 790 (quotes and cite omitted). He must also get around the fact that it is normal for appellate lawyers "to weed out some arguments to stress others and advocate effectively." *Id.* (quotes and cite omitted). Put

---

[8] In Georgia, a defendant's incriminating statement is admissible when it constitutes an admission against the *defendant's* penal interest. After all, the *defendant's* declaration against penal interest is the admission of a *party*-opponent. *Teal v. State*, 282 Ga. 319, 327 (2007). But one may not admit the hearsay declaration of a *third party* and thus peg it under that third party's declaration against *his* (here, Williams's) penal interest. *Stanford v. State*, 272 Ga. 267, 269 (2000), cited in doc. 11-3; GREEN, GA. LAW OF EVIDENCE § 286 (2010-2011).

another way, "abandoning one defense in favor of another that counsel reasonably perceives to be more meritorious is not deficient performance." *Id.* (quotes and cite omitted).

McKinney cannot show that here. Although it is debatable that "*any* competent attorney in the same situation would have" omitted the *Holmes* claim when presenting McKinney's *Crawford* claim on direct appeal to the Georgia Supreme Court, it is not an unreasonable application of federal law to so reason, as no U.S. Supreme Court holding has said otherwise. And even if that "any lawyer" ruling was unreasonable, McKinney nevertheless cannot show prejudice because the state trial court simply did not engage in impermissible evidence weighing -- the core requisite to a *Holmes* claim. Instead, it did what *Holmes* expressly permits: exclude the evidence under ordinary state evidentiary (hearsay) rules.[9] As the state habeas court correctly found,

---

[9] Note that

"[f]ederal courts generally do not review a state court's admission of evidence in habeas corpus proceedings.... We will not grant federal habeas corpus relief based on an evidentiary ruling unless the ruling affects the fundamental fairness of the trial.... A denial of fundamental fairness occurs whenever the improper evidence is material in the sense of a crucial, critical, highly significant factor." *Mills v. Singletary*, 161 F.3d 1273, 1289 (11th Cir. 1998) (citations and internal quotation marks omitted); *see also Wood v. Quarterman*, 503 F.3d 408, 414 (5th Cir. 2007) ("the erroneous admission of prejudicial evidence will justify habeas relief only if the admission was a

McKinney never made any attempt to establish (on independent grounds) the reliability of the January 12, 2004 letter.[10] Doc. 11-3 at 8. Finally, it is debatable how "helpful" Williams's letter and testimony would have been to McKinney's case, as it shows that Williams (a) is a murderer; and (b) was willing to testify -- but only for money. A reasonably competent lawyer may well have elected to forego this evidence given the "blow-back risk" of calling Williams to the stand: A jury may well have found Williams's testimony laughable and thus thought McKinney desperate for using him as a defense witness.

McKinney also pleads "substantive due process" on this claim. Doc. 10 at 9-10. Respondent acknowledges the claim, doc. 9 at 6, but the

---

crucial, highly significant factor in the defendant's conviction") (citation omitted). Thus, to obtain habeas relief based on the erroneous admission of evidence, a petitioner must show "that the testimony had a substantial and injurious effect or influence" on the jury's verdict. *Wood*, 503 F.3d at 414 (citations omitted).

*Kleine v. King*, 2010 WL 3085606 at * 3 (S.D. Ala. Aug. 5, 2010).

[10] The state habeas judge wrote about "letters." Doc. 11-3 at 8. There were other writings, including a letter that McKinney said Williams passed to him in jail, instructing McKinney what to say about what happened to Deal if asked. SHH Vol. I, "Bates Stamp" page 66-67; *see also* SHH Vol. IV at 1202; Vol. V at 1348-49 (McKinney testifying, pretrial, about it); SHH Vol. V at 1374 (trial court allowing its admission); SHH Vol. VI at 1714-212 (McKinney testifying about it); SHH Vol. VII at 1936-37 (Darden referenced it in recounting his defense strategy). Before this Court, however, McKinney focuses only on Williams's January 12, 2004 letter to McMinney's mother. Doc. 10 at 5-12; *see also* SHH Vol. VII at 1913.

state habeas opinion makes no mention of it, doc. 11-3, and respondent does not object. A somewhat controversial doctrine, *McDonald v. City of Chicago, Ill.*, ___ U.S. ___, 130 S. Ct. 3020, 3062 (2010) (Thomas, J., concurring) ("The one theme that links the Court's substantive due process precedents together is their lack of a guiding principle to distinguish 'fundamental' rights that warrant protection from nonfundamental rights that do not."), substantive due process protections extend only to certain fundamental rights so "implicit in the concept of ordered liberty" that "no amount of process can justify [their] infringement." *McKinney v. Pate*, 20 F.3d 1550, 1556-67 (11th Cir. 1994); *see also T.W. ex rel. Wilson v. School Bd. of Seminole County, Fla.*, 610 F.3d 588, 598 (11th Cir. 2010).

So although it cannot be said that substantive due process has no application in a generic criminal case, *Gilbert v. United States*, 609 F.3d 1159, 1165 n. 11 (11th Cir. 2010) ("the right not to be imprisoned for a nonexistent offense is probably inherent in the modern interpretation of substantive due process."), McKinney has cited no "fundamental right" for which no amount of process can justify its infringement.  Indeed, the courts have been *applying* procedural due process (the various rules of

court, established doctrines, etc.) to adjudicate his *Holmes* claim, and he has not even hinted at how his Sixth Amendment (Confrontation and Cross-Examination) rights have been insufficiently protected by the process applied to them, or have otherwise risen, in this context, to a "fundamental rights" level. For that matter, he has not shown that his "*Holmes* right" was violated. Accordingly, this claim also fails.

## B. Grounds Two and Three: John McMillan

In Grounds two and three McKinney insists both his trial counsel (Darden) and appellate counsel (Hilliard) were ineffective for dropping the ball on inmate John McMillan's alibi testimony. Doc. 1 at 5; doc. 10 at 12-14. McMillan, says McKinney, was never charged with anything and would have corroborated McKinney's claim that he was not involved in Deal's murder. Doc. 10 a 12-14. And, he points out, McMillan's name was furnished by the prosecution, pretrial, to Darden. *Id.* at 12-13; *see also* SHH Vol. VII at 1946-47 (Darden, during new-trial-motion hearing, acknowledged that McMillan was known to Darden as one "who should have been" charged as an accomplice to Deal's murder but whom Darden

did not call as a trial witness); *see also id.* at 1950 (Darden again acknowledging that McMillan was known to him pretrial).[11]

This is a "double-layered IAC claim" -- McKinney alleges that Darden was ineffective for failing to interview and call McMillan and that Hilliard was ineffective for failing to litigate Darden's ineffectiveness over that omission. The state habeas court acknowledged the claim against *Darden*, doc. 11-3 at 2 (ground 1(a)); *see also* doc. 11-2 at 4 (McKinney raised it), but deemed it procedurally defaulted since McMinney (hence, Hilliard) failed to raise it on direct appeal, doc. 11-3 at 3-4, even though that claim against Darden essentially comes back to the

---

[11] In fact, Darden knew about "Unit 5" -- the jail area where Deal's murder occurred:

Q. [B]ased on your investigation[,] who were the people who were in Unit 5? I guess it's a segregated population or whatever it is.

A. [Darden] Yeah.

Q. Who were the people who were residing there?

A. You mean the inmates?

Q. The inmates.

A. Mike Wilson, Mr. McKinney, Joseph Williams, Pierre Boyd, [Deal], *McMillan.* How many have I named?

Q. That sounds about right.

SHH Vol. VII at 1950 (emphasis added).

judicial block through McKinney's IAC claim against Hilliard (since cause for failing to raise an issue can be established by the ineffectiveness of appellate counsel's failure to raise it). S*ee, e.g.*, *Murray v. Carrier*, 477 U.S. 478, 488-89 (1986) (IAC can qualify as sufficient cause). For that matter, the state habeas judge *did* address McKinney's claim against *Hilliard*, which was premised upon Hilliard's failure to litigate Darden's ineffectiveness, but failed to discuss Darden's failure to call McMillan. Doc. 11-3 at 9-10.

That renders problematic this Court's application of § 2254(d)(1), since federal habeas courts typically cite to record evidence showing that the state court has actually considered an issue. *See, e.g., Jones v. Frazier*, 2010 WL 3745592 at * 4-5 (M.D. Ga. Aug. 23, 2010) (applying § 2254(d)(1) deference to Georgia appellate court's explicit, record-supported IAC ruling on counsel's failure to call alibi witness); *Rosado v. Secretary, Dep't of Corr.*, 2010 WL 2976886 at * 5 (M.D. Fla. July 20, 2010) ("The [state] postconviction court, finding counsel's testimony credible, concluded that counsel had not been told by Rosado of the existence of a potential alibi defense regarding his brother and sister-in-law. The State Court's conclusion that counsel was not deficient for

failing to investigate those witnesses is objectively reasonable and must be given deference by this Court.").

Nor has this Court been shown any "residual statement of review," *see Land v. Allen*, 573 F.3d 1211, 1215-16 (11th Cir. 2009) (although Alabama Supreme Court did not explicitly address specific claims, it stated that it had thoroughly reviewed the issues raised before a lower court and the additional issues petitioner raised for the first time before it and found no error), or "implicit" ruling. *Blankenship,* 542 F.3d at 1272-73 (state court's implicit findings of fact are entitled to deference under AEDPA to the same extent as explicit findings of fact). "While federal courts typically must give deference to state court adjudications of claims in a habeas petition, *see* 28 U.S.C. § 2254(d)(1), such deference is not required if the state court failed to the address the merits of a claim asserted by the petitioner." *Bellizia v. Fla. Dep't of Corr.*, 614 F.3d 1326, 1328 n. 1 (11th Cir. 2010); *see also Porter v. McCollum*, ___ U.S. ___, 130 S. Ct. 447, 452 (2009) ("Because the state court did not decide whether Porter's counsel was deficient, we review this element of Porter's *Strickland* claim de novo").

During the new-trial motion hearing Darden testified about his core defense strategy -- that McKinney played no part in the crime:

> [N]o one had any information concerning [the murder]. And then lo and behold, about five days later everybody began to talk, including Mr. McKinney. Our strategy was to show that he had been threatened by Joseph Williams and in fact had been instructed by Joseph Williams what to testify to, and he in fact had a letter that we got into evidence, was brought out on cross-examination where Joseph Williams specifically told him, "If you are asked anything about the case, this is what you are to say." And we compared that to the actual confession he made and show how they both jived. And our argument was that he was coerced into making that statement, the statement was not trustworthy, *he didn't have anything to do with the murder itself*. [¶] We then attacked the credibility of Pierre Byrd. . . .

SHH Vol. VII at 1936-37 (emphasis added); *see also* SHH Vol. IV at 1203.

It therefore made sense for Darden to at least attempt to interview the small handful of inmates who were nearby when Deal was murdered. Courts have granted IAC-based habeas relief for missing basic investigation-level omissions like that.[12] Yet, it is undisputed that

---

[12] *Compare Brown v. Myers*, 137 F.3d 1154, 1156-58 (9th Cir. 1998) (IAC performance prong met when counsel failed to investigate petitioner's alibi claim or present any alibi witnesses to corroborate his testimony; likelihood of jury crediting petitioner's defense when corroborated by alibi witnesses not called at trial, including petitioner's sister, was sufficiently likely to undermine confidence in outcome of trial); *Hadley v. Groose*, 97 F.3d 1131, 1135 (8th Cir. 1996) (IAC claim upheld in a weak-prosecution case arising from counsel's failure to investigate and present defendant's alibi); *Washington v. Smith*, 219 F.3d 620, 629-30 (7th Cir. 2000) (defense counsel rendered constitutionally deficient performance when he failed to produce

Darden made *no* attempt at all to interview McMillan.  Nor did Hilliard; only McKinney's habeas counsel did.  McMillan testified at the state habeas hearing that he was available to testify but no one except habeas counsel ever contacted him.  SHH Vol. I at 35, 36 (McMillan testified that no lawyer ever contacted him pretrial, McKinney's habeas lawyer was the first); *id.* at 24, 30 (McKinney testified that he asked Darden to interview McMillan but Darden did not); *id.* at 58 (habeas counsel emphasizing to state habeas judge that McMillan "could have been interviewed and should have been interviewed").  That testimony stands unrebutted.

---

critical alibi witness at trial, after having failed to contact witness prior to trial and waiting to subpoena her until two days before she was to testify, despite knowledge that she was hard to reach; counsel could not put the witness's convenience above his client's interests, and counsel's efforts to secure the witness did not demonstrate minimal diligence that effective counsel would have employed); and *Young v. Washington,* 2010 WL 3767596 at * 7 (W.D. Wash. Sep. 20, 2010) (collecting similar result cases and reaching same result in that case), *with Lott v. Attorney General*, 594 F.3d 1296, 1301-02 (11th Cir. 2010) (trial counsel's investigation of capital murder defendant's alibi was not deficient; exhaustive efforts made to locate alibi witness and circumstances supported strategic judgment to forego alibi defense); *Prosser v. McNeil*, 2008 WL 5235337 at * 7-8 (M.D. Fla. Dec. 15, 2008) (no IAC-based habeas relief for failure to investigate and call alibi witnesses; trial counsel was an experienced criminal attorney and made reasonable efforts to locate witnesses, but could not find them; nor could petitioner  show that a reasonable probability existed that the outcome of the case would have been different); and CRIMINAL PROCEDURE HANDBOOK § 3:44 (*Strategy of counsel -- Witnesses--Alibi witnesses*) (2010) (collecting similar result cases).

The failure to investigate a particular lead may be excused if a lawyer has made a "reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691; *Washington*, 219 F.3d at 631. But *Strickland* requires reasonable professional judgments before limiting a defense investigation, and that standard is violated when counsel does not even bother to contact, much less interview, a reasonably obvious potential defense witness. *Wiggins v. Smith*, 539 U.S. 510, 527, 533 (2003) (an attorney's decision to forgo a particular line of defense is not necessarily reasonable simply because it is based on "some information" obtained in a limited investigation; instead, the habeas court must consider not only the quantum of evidence already known to counsel, but also "whether the known evidence would lead a reasonable attorney to investigate further.").

Two major omissions thus affect this Court's analysis: Darden's in failing to even acknowledge McMillan, and the state habeas court's in failing to address McKinney's IAC claim against Darden. *Compare Porter*, 130 S. Ct. at 453 (applying *Wiggins* while according no § 2254(d)(1) deference to state court's ruling on failure-to-investigate IAC claim, then concluding that counsel was prejudicially ineffective for

failing to adequately investigation capital defendant's mitigation defense); *Howard v. Clark*, 608 F.3d 563, 570-71 (9th Cir. 2010) (applying *Wiggins* to deny § 2254(d)(1) deference to state court's disposition of failure-to-investigate IAC claim); *Riley v. Payne*, 352 F.3d 1313, 1319-20 (9th Cir. 2003) (applying *Wiggins* to deny § 2254(d)(1) deference to state court's disposition of failure-to-investigate IAC claim and finding deficient defense counsel's performance in failing to interview defendant's associate who was with him during the initial confrontation with victims was deficient, in prosecution for assault with deadly weapon; associate asserted that he would have testified that he was with defendant during first part of confrontation, that the victims started threatening defendant, that one victim stated that he was going to shoot defendant, that associate ran away because he was afraid, and that defendant later told associate that one victim tried to shoot him; counsel could not have fully assessed associate's version of events, or his credibility without interviewing him, and there was no reason disclosed for counsel's failure to interview associate), *with DeYoung* 609 F.3d at 1286-87 (applying *Wiggins* while *according* § 2254(d)(1) deference to state court's ruling on failure-to-investigate IAC claim).

The state habeas court ruled that the IAC claim against *Darden* was not raised by "new counsel" (i.e., Hilliard) so it is procedurally barred unless McKinney can show cause for Hilliard's failure to raise it and prejudice arising therefrom, or a miscarriage of justice. Doc. 11-3 at 3-4. In denying the claim against Hilliard, the habeas judge found that he extensively prepared for the appeal and had no independent recollection whether McMillan's name was ever brought up during his discussion with McKinney on what to appeal. Doc. 11-3 at 9.[13] Consequently, that court ruled, McKinney failed to show that Hilliard was deficient for failing to raise this issue on direct appeal. *Id.*

As noted above, however, Darden appears to have omitted a basic investigative step, and Hilliard asked Darden about McMillan during the new-trial-motion hearing. SHH Vol. II at 1946-47. Hilliard thus had to have been aware of Darden's "wrong-man" strategy (that the prosecution was prosecuting the wrong man for the crime) as this was obvious from the trial transcript. So Hilliard did not need a layperson (his client, McKinney) to tell him to do what Darden did not: conduct a

---

[13] This is corroborated by the new-trial-motion transcript, where Hilliard questioned Darden and only brought up McMillan's name in passing. SHH Vol. VII at 1946-47.

basic investigation of the crime.[14]   By definition, that would include

talking to the small handful of inmates in and around the murder scene

that day.

To prevail on an IAC claim here, a petitioner must show that the

course of action taken by counsel would not have been taken by any

competent counsel. *Blankenship*, 542 F.3d at 1273.   Given the "I didn't

do it" defense strategy, it is difficult to conceive how any reasonable

lawyer would not have interviewed McMillan, who was one the small

handful of inmates on the murder scene that day.[15]   Given the

---

[14]   Hence, this case is easily distinguishable from *Cummings v. Sec'y for Dep't of Corr.*, 588 F.3d 1331, 1357 (11th Cir. 2009) (scope of counsel's duty to investigate mitigation evidence is substantially affected, for Sixth Amendment purposes, by defendant's actions, statements and instructions); *see also Johnson v. Upton*, ___ F.3d ___, 2010 WL 3294102 at * 11 (11th Cir. Aug. 23, 2010).   These cases hold the defendant himself responsible if he is, for example, the primary source for mitigation evidence but simply fails to disclose it, or inhibits development of it.   Nothing like that was involved here, where the crime was confined to a small area amongst a small group of people.   It is difficult to imagine how defense counsel could *not* focus on interviewing that entire group.

[15]   The *Johnson* court reminds that

"[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."

2010 WL 3294102 at * 10 (quoting *Strickland*, 466 U.S. at 690-91).   This Court has been shown *no* reasonable professional judgment supporting Darden's limitation of his investigation -- to not interview McKinney.   The same must be said for Hilliard.

presentation to the state habeas court, it follows that Hilliard should have at least inquired (as did McKinney's later, state habeas counsel) of McMillan. Yet, the state habeas ruling is silent on this, undermining § 2254(d)(1) deference for its ruling on *Strickland's* deficiency prong.

In that regard, the state habeas court also found facts in ruling that McKinney could show no prejudice:

> Moreover, the Petitioner has not shown a reasonable probability that the outcome of his appeal would have been different if appellate counsel had raised ineffective assistance of trial counsel on appeal. The Petitioner failed to demonstrate how McMillan's testimony would have exonerated him. Assuming McMillan would have testified at trial the same as he did at the Petitioner's habeas hearing, McMillan testified that he was at the "other end of the cell building block watching TV at the other end" when the murder occurred. [SHH Vol. I at 33] He further testified that he thought he had seen the Petitioner in Petitioner's cell prior to the murder, but that he did not witness the murder take place or have any independent knowledge as to who actually committed the murder. *Id.* at 36-37. As such, this claim provides no basis for relief.

Doc. 11-3 at 10.

Does this finding constitutes an unreasonable determination of the facts within the meaning of 28 U.S.C. § 2254(d)? At the state habeas evidentiary hearing McMillan's testimony -- no model of clarity -- *could* be construed to mean that he saw McKinney in McKinney's cell as

McMillan walked by -- "*when* the murder happened" -- though he (McMillan) did not actually see the murder, much less know who did it. SHH Vol. I at 36; *see also id.* at 33.[16] So read, that provides McKinney

---

[16] McMillan testified before the state habeas court:

    Q.  Do you recall the day that Michael Deal was killed?

    A.  Yes, I do.

    Q.  Okay.  And where were you *when that happened*?

    A.  I was on the other end of the -- the other end of the cell building block watching the TV on the other end.

    Q.  On the other end?

    A.  Yeah.

    Q.  And where was Mr. McKinney at that time?

    A.  I believe he was in his cell.

    Q.  Okay.  Did you see him in his cell?

    A.  Yeah, before I walked down to the other end, because, you know, my cell was like right next to his.  So I could see -- when I walked by, yeah, I believe he was in  his cell.

SHH Vol. I at 33-34 (emphasis added).  *Respondent's* counsel reinforced McMillan's alibi testimony during her cross-examination of him:

    Q.  Okay.  Now, you  -- did you see Michael Deal get killed?

    A.  No.  No, ma'am.

    Q.  Okay.  So I understand, you said you thought Mr. McKinney was in his cell as you walked by?

with an alibi. And it obviously would not matter that McMillan did not actually witness the murder; plenty of alibi witnesses do not observe the crime but their testimony (that the defendant was somewhere else at the time of the murder, which often means that the witness, too, was somewhere else during the murder) is still palpably relevant.

For that matter, respondent does not even attempt to rebut McKinney's IAC prejudice showing:

> McMillan's testimony would have corroborated Petitioner's trial testimony. Further, it would have been consistent with Joseph Williams January 12, 2004 letter, making it more likely that letter would have been admissible. As further support for that *Strickland's* prejudice prong is satisfied is that the jury did not find Petitioner guilty as to the malice murder count, indicating some question as to the State's theory of the case. Because Petitioner's trial counsel failed to interview and call John McMillan as an

---

A. Right. Me and his cell is like right next to each other. I'm like right here. I got to pass his cell to get to the -- down to the next TV.

Q. Okay. And so that's where you were *when the murder happened* --

A. Yeah.

Q. -- as far as you know?

A. Yeah. As far as I know, yeah.

Q. So you didn't -- you have no knowledge of who did it?

A. No knowledge.

*Id.* at 36-37 (emphasis added).

39

exculpatory witness at trial, Petitioner received ineffective assistance of trial and appellant counsel.

Doc. 10 at 13 (McKinney's brief).

Still, *Strickland's* prejudice prong is a steep wall to climb. *See, e.g.*, *Forrest v. Fla. Dep't. of Corr.*, 342 F. App'x 560, 564 (11th Cir. 2009) (defendant was not deprived of effective assistance of counsel by counsel's failure to call purported alibi witness, in prosecution for aggravated assault with a firearm; while there was no showing as to the reason why counsel decided not to call the witness, there was no showing that the witness's testimony would have likely changed the result of the trial, in light of other testimony and physical evidence demonstrating that defendant was the shooter); *see also Johnson*, 2010 WL 3294102 at * 10 (in applying *Strickland's* prejudice prong courts consider both trial *and* state habeas proceeding evidence).

It does not matter whether § 2254(d) deference should be accorded to the state habeas court's finding on this matter, because upon *de novo* review of that court's record, this Court concludes that McKinney can show no prejudice. His jury repeatedly heard from Byrd, the state's star witness, that McMillan was one of the inmates who was attempting to chisel his way to freedom inside McKinney's cell, SHH Vol. VI at 1485,

1489-90. Deal walked in on McKinney, Michael Wilson (another would-be escapee), and McMillan and was told to "mind his own business." *Id.* 1491; *see also id.* at 1522. McMillan also participated in the conspirators' conversation about killing Deal to silence him and thus protect their escape plan. *Id.* at 1492. And, after Williams and McKinney murdered Deal, McMillan helped them stage the suicide scene. *Id.* at 1500. Too, McMillan conspired with Williams, Michael Wilson and McKinney to kill another inmate, Anthony King. *Id.* at 1504.[17] Finally, in his note to a jail official, Byrd also directly implicated McMillan (conspiratorily, at least) in Deal's murder. *Id.* at 1584-85.

It is not unreasonable to conclude that if called, McMillan would have been dismissed by the jury as a lying convict. Moreover, it is debatable whether the trial judge would not have ensured that McMillan be represented by counsel, since he would have faced potential prosecution for perjury under oath if he lied or some sort of conspiracy-

---

[17] This may not be true. Byrd so testified, SHH Vol. VI at 1504, but there are differing accounts. *See Williams*, 281 Ga. at 88 ("After the murder, Williams and Byrd favored also killing King and Dewey Anderson, but McKinney and McMillan objected."). What is relevant, however, is the range of information that an objectively reasonable attorney in Darden's position would have to risk exposure to upon selecting a particular trial strategy. Georgia's Department of Corrections records show why McMillan, for that matter, was in jail at that time: He ultimately convicted for a July 4, 2001 murder that he committed. (Deal, incidentally, was murdered on July 24, 2001, *see Williams*, 281 Ga. at 87 n. 1.)

based or accessory-after-the-fact charges. That, in turn, meant a reasonable chance that he would have invoked his Fifth Amendment rights if cross-examined and asked about Byrd's account of his own involvement in the Deal murder, if not also his conspiratorial planning to kill Anthony King. Finally, McMillan's testimony about what he saw, *when* he saw it, is at best thin. *See supra* n. 16. So even if it can be said that Darden was *Strickland* deficient for not interviewing a significant witness it is not reasonably likely that the outcome would have been different here. Hence, McKinney's McMillan-based IAC claims fails.

## C. Ground Four: Woody Boyd and Patti Simmons

At his Motion for New Trial, McKinney complained that Darden failed to subpoena GBI Agent Woody Boyd and Probation Officer Patti Simmons. He also failed to interview them pretrial. Williams, it turns out, had threatened McKinney and his family, and McKinney seems to say that this made him confess to Boyd. But then he tried to recant that, and these witnesses would have bolstered him on that score. Doc. 10 at 14. Thus, Darden's failure to interview and call them to trial constituted IAC. *Id.*

McKinney concedes this issue was raised and addressed on direct appeal, *id*. at 15, and again before the state habeas court. Doc. 11-3 at 10-11 (restating Darden's explanation that the same information "had been elicited during cross-examination of a State's witness"). Again, trial counsel Darden did not call these witnesses -- he learned of them mid-trial -- because he consulted with McKinney and they decided against that; the information they would have provided had already been elicited during cross-examination of state witness. *McKinney*, 281 Ga. at 93-94. McKinney makes no attempt here to suggest how this claim is not foreclosed now (e.g., he cites no state-court evidentiary, or other ruling, rendering his trial fundamentally unfair, and thus no reason to pierce the § 2254(d) deference this Court must accord). It thus must be denied.

## D. Ground Five: Pierre Byrd

McKinney next insists that the state violated his Confrontation Clause rights, and thus Darden was ineffective for failing to object, when inmate Pierre Boyd testified about the statements McKinney and other inmates made about knocking off Deal to protect their escape effort. Doc. 10 at 15-19. The state habeas court ruling is silent on this claim, and Byrd was mentioned only in passing during that court's evidentiary

hearing, SHH Vol I at 55; *see also* SHH Vol II at 317-27 (Byrd's interview), but the Georgia Supreme Court reached the claim on the merits, denying it as meritless because, first, Georgia's co-conspirator exception to the hearsay rule supported the admission of Byrd's testimony. *McKinney*, 281 Ga. at 94 (Darden "testified he did not object to the hearsay testimony of the note-passing inmate because he believed the hearsay statements fell within the exception permitting hearsay statements made by co-conspirators during the pendency of the conspiracy. *See* OCGA § 24-3-5. Inasmuch as trial counsel was correct … his failure to object did not constitute deficient performance."). Second, under *United States v. Underwood*, 446 F.3d 1340, 1347-48 (11th Cir. 2006), Byrd's statements were nontestimonial. *McKinney*, 281 Ga. at 96.

McKinney fails to show that the state court's factual findings are in any way flawed, and his *Crawford/Confrontation Clause* claim is at best a fanciful contrivance. In essence, he simply discredits Byrd, then launches his constitutional attack based on *that* premise: "In this case, the whole idea of a conspiracy upon which the State's entire case rested on Petitioner, was *planted* by testimony by Byrd regarding what Williams, McMillan and Petitioner said." Doc. 10 at 16 (emphasis

added).  Because, this argument goes, "Byrd's testimony was *based on* statements made by Williams, McMillan and Petitioner," *id.*, McKinney's Confrontation rights were violated because Byrd testified without McKinney being able to confront Williams.  *Id.*

Put another way, any testimony by "A" that "B" said something (under the co-conspirator exception to the hearsay rule) entitles "C" (the defendant) to confront "B" at trial.  Of course, this is just another way of objecting to the co-conspirator exception to the hearsay rule.  Were this particular claim upheld, then, prosecutors would never be able to adduce co-conspirator hearsay evidence, for now they would be forced to produce each co-conspirator/speaker at trial.  Naturally, McKinney cites *no* authority to support this argument.  Suffice it to say that he fails to show that the state habeas court engaged in an unreasonable application of federal law.  *Forrest*, 342 F.App'x. at 559 ("We conclude that the state court's decision was not "contrary to" clearly established federal law because the state court applied the appropriate standard, as identified by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and there is no Supreme Court case with

materially indistinguishable facts dictating a different outcome than that reached by the state court.").

### E.  Ground six: Agent Barry

In Ground Six McKinney says that he had two interviews with GBI agent Barry,[18] and Darden was ineffective for failing to object to Barry's statement based on this since his statements to Barry were "neither confession nor an admission, and thus hearsay without exception."  Doc. 1 at 4; *see also* doc. 10 (McKinney's supporting brief) at 19-20.  Here the petitioner simply rehashes the same claim addressed by the *McKinney* court, which explained that Darden was not ineffective because Barry's testimony about McKinney's initial statement to him (McKinney denied knowledge of Deal's murder) bolstered the defense theory of the case (which McKinney does not now question or abandon) "that the initial statement was true and [McKinney] had given the subsequent inculpatory statement only after being threatened by co-indictee Williams."  *McKinney*, 281 Ga. at 94.  This claim fails outright, as

---

[18]    At trial Barry testified that he conducted a "pre-interview" with McKinney "because I was curious to know what he had to say."  SHH Vol. VI at 1585.  During that first interview McKinney told Barry that he was fearful, and "that there was conspiracy among individuals in his cell, just as he wrote in the note, to strangle Michael Deal and make it look like a hanging, and that Michael was actually killed with the use of an Ace bandage and then a sheet was placed around his neck and, in cooperation, they all hung him up to make it -- stage a suicide (sic)."  *Id*. at 1586.

McKinney does not even bother to argue, much less show, how the state court unreasonably applied federal law. Doc. 1 at 4; doc. 10 at 19-20.

## F. Ground seven: The Polygraph

Ground seven must suffer the same fate as Ground six. Here the petitioner conclusorily rehashes the same argument made to and rejected by the *McKinney* court. Again, he does not even bother to argue, much less show, how the state court unreasonably applied federal law. This claim, too, must therefore be denied.

## G. Ground eight: Agent Barry, Again

To reiterate, McKinney contended on direct appeal that the trial court should have granted his motion to suppress his videotaped (second) "GBI statement" because a lawyer representing him on unrelated charges was not contacted prior to the interview that produced his incriminating statement. The *McKinney* court rejected this claim because his right to counsel is "offense-specific" and he was *Mirandized* before that interview. *McKinney*, 281 Ga. at 95 (citing *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991)). Petitioner rehashes that claim here, doc. 1 at 4; doc. 10 at 20-22, then ignores both *McNeil*[19] and his

---

[19] As the Eleventh Circuit reminds:

burden to show that the state courts unreasonably applied federal law. This claim also fails.

## H. Ground nine: Pierre Byrd

Finally, McKinney complains again about Pierre Byrd's testimony: He "was allowed to give testimony regarding the Statements of John McMillan and Joseph Williams regarding the alleged conspiracy between the four of them, thus violating the Petitioner's right to confront his accuser as guaranteed by the Six Amendment of the United States Constitution." Doc. 1 at 4; doc. 10 at 22. This is, substantively speaking, the same contrived argument as set forth in Ground five above -- that any hearsay exception testimony by definition will support a

---

The Sixth Amendment right is "offense specific" though. *McNeil v. Wisconsin*, 501 U.S. 171, 175, 111 S.Ct. 2204, 2207, 115 L.Ed.2d 158 (1991). "It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings--whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Id*. (quotation marks and citation omitted); *see also Rothgery v. Gillespie County, Tex.*, ___ U.S. ___, 128 S. Ct. 2578, 2592, 171 L.Ed.2d 366 (2008) (reaffirming that "a criminal defendant's initial appearance before a judicial officer, where he learns the charge against him and his liberty is subject to restriction, marks the start of adversary judicial proceedings that trigger attachment of the Sixth Amendment right to counsel").

*Philmore v. McNeil*, 575 F.3d 1251, 1257-58 (11th Cir. 2009). The Georgia Supreme Court applied *McNeil*, and McKinney simply talks around that fact here.

Confrontation Clause violation because the co-conspirator whose statement is being repeated by the testifier himself is not testifying. For the same reasons, this claim also must be denied.

## IV. CONCLUSION

Leon McKinney's 28 U.S.C. § 2254 petition should be **DENIED**. Applying the Certificate of Appealability ("COA") standards set forth in *Brown v. United States*, 2009 WL 307872 at * 1-2 (S.D. Ga. Feb. 9, 2009) (unpublished), the Court discerns no COA-worthy issues at this stage of the litigation, so COA should be **DENIED**. 28 U.S.C. § 2253(c)(1); *see Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) (approving *sua sponte* denial of COA before movant filed a notice of appeal). And, as there are no non-frivolous issues to raise on appeal, an appeal would not be taken in good faith. Thus, *in forma pauperis* status on appeal should likewise be **DENIED**. 28 U.S.C. § 1915(a)(3).

**SO REPORTED AND RECOMMENDED** this __7th__ day of October, 2010.

_____
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT of GEORGIA